DISCIPLINARY COUNSEL *v.* SMITH.

[Cite as *Disciplinary Counsel v. Smith,* 124 Ohio St.3d 49, 2009-Ohio-5960.]

*Attorneys — Misconduct — Charging excessive fees — Accepting employment in a legal matter for which lawyer was not professionally competent — Public reprimand.*

(No. 2009-1144 — Submitted September 15, 2009 — Decided November 19, 2009.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 08-019.

_____

MOYER, C.J.

{¶ 1} Respondent, Justin Martus Smith of Cleveland, Ohio, Attorney Registration No. 0072044, was admitted to the practice of law in Ohio in 2000. The Board of Commissioners on Grievances and Discipline recommends that we publicly reprimand respondent for his conduct in charging two clients excessive fees and representing them in legal matters for which he was not competent, while under the supervision of the owner of the law firm with which he was associated. We agree that respondent committed the misconduct found by the board and, accordingly, publicly reprimand respondent.

## I. Procedural History

{¶ 2} Relator, Disciplinary Counsel, filed a complaint against respondent, alleging violations of two Disciplinary Rules arising from respondent's conduct in helping two clients of his law firm to obtain compensation for injuries sustained in an auto accident. A panel of the board concluded that respondent had committed both violations of the Code of Professional Responsibility and recommended a public reprimand. The board

adopted the panel's findings of fact, conclusions of law, and recommended sanction.

{¶ 3}  Respondent filed objections to the board's decision, arguing that the evidence did not support the findings that he had violated the Disciplinary Rules and thus that the complaint should be dismissed.

## II. Misconduct

### A. Factual Background

{¶ 4}  In May 2002, having been admitted to the practice of law in Ohio for two years and employed as an associate in the Chapman Law Firm, owned by Frank Chapman, respondent was assigned to the case of Louis and Florence Reiger.  The Reigers were passengers in the vehicle of Marvin Seltzer and his wife when they were involved in an accident.  Seltzer lost control of the car while driving on an Ohio expressway, causing it to flip into the median.  Louis Reiger was seriously injured in the accident and required extensive medical treatment, hospitalization, and rehabilitation.  Florence Reiger was also injured, although less seriously.  She also required medical treatment and hospitalization.

{¶ 5}  After viewing the firm's advertisement in the yellow pages, the Reigers contacted the Chapman Law Firm, and respondent was assigned to the case.  He visited Florence Reiger at the hospital and presented a contingent-fee agreement to her.  The agreement provided for attorney fees of 33 1/3 percent of the gross amount if the case was settled without filing a lawsuit, 40 percent of the gross settlement or judgment if suit was filed, and 45 percent of the gross settlement or judgment following a trial or appeal.  Respondent signed the agreement on behalf of the firm, and Florence signed on her own behalf and on behalf of her husband, Louis, as his attorney in fact, although she did not show respondent any documentation that she held her husband's power of attorney. Respondent never met with Louis because he was a patient at a different hospital.

**{¶ 6}** Seltzer was insured by a Geico automobile insurance policy with a $100,000-per-person limit for personal injury. He had no other assets that would allow for additional recovery. The Reigers, who were residents of New York, carried an insurance policy with State Farm Mutual Automobile Insurance Company ("State Farm") in New York. Their policy included personal-injury protection ("PIP") coverage of $175,000 per person. Under New York law, PIP coverage is no-fault insurance paid without a determination of liability. N.Y.Ins.Law 5101 et seq. PIP claims for medical and hospitalization expenses are paid directly to medical service providers. The providers may apply for the coverage themselves. Most importantly, New York law does not permit an attorney to collect a contingent fee from a client on PIP payments.

**{¶ 7}** On September 11, 2002, respondent filed suit on behalf of the Reigers against Marvin Seltzer. Neither insurance company was named in the suit. In October 2003, Geico paid the full $100,000 policy limit for Florence Reiger. Respondent endorsed the check from Geico that was payable to Florence by signing the names of both clients and his own name. In May 2004, Geico paid the full $100,000 policy limit for Louis Reiger. Respondent also endorsed this check, payable to Louis, by signing both clients' names and adding "POA" after each. Respondent did not have a power of attorney for either client that specifically authorized him to sign their names on checks. Respondent testified that he was just doing what Chapman instructed.

**{¶ 8}** In November 2002, respondent applied for PIP coverage for both Louis and Florence Reiger by completing the appropriate State Farm paperwork. Cleveland MetroHealth Hospital had, however, already applied for PIP coverage on behalf of Louis Reiger. State Farm paid the policy limit of $175,000 for Louis directly to the hospital. Upon respondent's application, State Farm also paid $33,152.91 in PIP coverage for Florence Reiger directly to Akron General Hospital. The Chapman Law Firm received none of the money paid by State

Farm. Respondent testified that he possessed a general understanding of PIP coverage as no-fault insurance, but he did not research the permissibility of collecting legal fees. Respondent testified that he collected the fees because, after he questioned Chapman regarding fees on PIP recovery, Chapman instructed him to do so. Respondent stated that he did not feel that it was his responsibility to research whether fees could be collected from the PIP recovery, despite being the Reigers' attorney, because Chapman set fees for the firm.

{¶ 9} In December 2003, respondent sent the first of three disbursement sheets to the Reigers, itemizing the recovery for Florence. The document noted a gross recovery of $139,159.92, the total of the $100,000 from Geico and the $39,152.92 from State Farm. This amount was reduced by $6,000 for a settlement negotiated by respondent with State Farm regarding the insurer's subrogation rights, by $3,500 for the cost of an asset investigation of Seltzer, and by $55,661 for respondent's legal fees (taken at 40 percent of the gross recovery). Florence's net recovery was listed at $34,839. The document did not mention the recovery of any funds for Louis, nor was a check for Florence enclosed.

{¶ 10} The second disbursement sheet was sent in September 2004, listing jointly the recovery for the Reigers. There was no separate itemization for each client because after respondent initially prepared separate documents, Chapman would not approve them. The initial separate document for Louis Reiger resulted in a negative disbursement, meaning he would have owed legal fees to the firm. Chapman told respondent to "make it work," which he did by combining Florence's and Louis's disbursements. Respondent testified that he informed Chapman that this would mean that the Reigers would receive less than the amount denoted in the first disbursement sheet for Florence alone, but Chapman rebuffed him.

{¶ 11} The document noted a total gross recovery from both State Farm and Geico of $414,152.92. Attorney fees were again calculated at 40 percent for

a total of $165,661.17, which was deducted from the gross recovery along with various other expenses, resulting in a joint disbursement to the Reigers of $8,207.46. The law firm sent the Reigers a check for that amount. Respondent testified that he prepared the disbursement sheet based on instructions from Chapman. Chapman directed respondent to collect 40 percent in fees from the total gross recovery even though no lawsuit had been filed against State Farm and the State Farm settlement was paid directly to the hospitals. Even after one of the Reigers' children complained to respondent about the amount of the fees, Chapman told respondent that he was collecting 40 percent of the recovery. Respondent then sent a follow-up letter with greater detail to the Reigers.

{¶ 12} A grievance was filed with the Office of Disciplinary Counsel regarding the attorney fees. After respondent received a request for additional information from Disciplinary Counsel, he sent the Reigers a revised disbursement sheet in February 2005. This final document deducted the $6,000 subrogation settlement from the State Farm PIP payments for Florence Reiger, rather than subtracting it as an expense. This change reduced the total recovery, thereby reducing the attorney fees and resulting in an increased disbursement for the Reigers of $2,400.

{¶ 13} The Reigers later sued respondent, Frank Chapman, and the Chapman Law Firm for legal malpractice and excessive fees. The case was settled when the Chapman Law Firm agreed to disgorge the attorney fees received on the PIP coverage of $83,261.17. The Reigers also received $18,738.83 under the malpractice insurance policy held by the firm.

### B. Disciplinary Rule Violations

{¶ 14} The board found that respondent violated DR 2-106(A) ("A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee"). We agree. Respondent has stipulated that the fees paid by the

Reigers were excessive but argues that Chapman was responsible for charging those fees.

{¶ 15} Although Chapman was the owner of the law firm, it was respondent who acted as the Reigers' attorney. Respondent signed the contingent-fee agreement, he filed suit on the Reigers' behalf, he submitted PIP claims on their behalf, he was the only attorney for the law firm that had any contact with them, and he prepared the disbursement sheets detailing their recovery and attorney fees.

{¶ 16} It is undisputed that the fees charged in this case were excessive. New York state law controls the State Farm insurance policies held by the Reigers. New York law prohibits the collecting of a contingent fee from a client on PIP coverage. Respondent and the Chapman Law Firm were thus prevented by law from collecting fees based on the PIP recovery that their clients received. Despite this, and despite the fact that the law firm received no part of the PIP recovery because it was paid directly to the hospitals that had treated the clients, respondent collected 40 percent of the funds for his fees. He did so by reducing the disbursement that the Reigers should have received from the Geico liability coverage.

{¶ 17} Respondent argues that he cannot be disciplined for his actions because Chapman had control of the fees and the firm's checkbook. Even though Chapman was his superior, respondent has a responsibility to his clients. Respondent's counsel stated at oral argument that respondent prepared the disbursement sheets as a scribe would, following the dictates of his superior. Actually, respondent is not a scribe but an attorney, responsible for zealously representing his clients' interests. We have stated previously that "new lawyers are just as accountable as more seasoned professionals for not complying with the Code of Professional Responsibility." *Disciplinary Counsel v. Johnson*, 106 Ohio St.3d 365, 2005-Ohio-5323, 835 N.E.2d 354, ¶ 39. The same general rule applies

6

to lawyers who are directly supervised by their superiors within a law firm. A lawyer's obligations under the ethics rules are not diminished by the instructions of a supervising attorney.

{¶ 18} Respondent claims that if only his conduct had occurred more recently, it would have fallen within the safe harbor of recently adopted Prof.Cond.R. 5.2. This assumption is incorrect. Prof.Cond.R. 5.2(a) states the general rule that "[a] lawyer is bound by the Ohio Rules of Professional Conduct notwithstanding that the lawyer acted at the direction of another person." The safe harbor appears in Prof.Cond.R. 5.2(b): "A subordinate lawyer does not violate the Ohio Rules of Professional Conduct if that lawyer acts in accordance with a supervisory lawyer's *reasonable* resolution of a question of professional duty." (Emphasis sic.)

{¶ 19} Prof.Cond.R. 5.2(b) would not apply to the circumstances of this case regardless of its effective date. First, there was no ambiguity in the illegitimacy of the fees because New York law clearly prohibits the collection of a contingent fee from the client on PIP coverage. Second, respondent and Chapman were both insufficiently familiar with PIP coverage, and they did not properly research the question of attorney fees. Although respondent apparently posed the question to Chapman, and Chapman said he would look into it, it was unreasonable for respondent to rely on Chapman's directions under the circumstances. The nature of PIP coverage as no-fault insurance that was to be paid directly to the Reigers' medical service providers should have alerted respondent to the issue of attorney fees. That context, coupled with the relatively small disbursement check issued to the Reigers compared to the total recovery, should have at least prompted respondent to seek confirmation from Chapman that his research verified the permissibility of attorney fees, if not to research the question himself. There is no indication in the record that respondent ever followed up with Chapman after Chapman stated that he would contact another

lawyer; nor did respondent verify the source of any information to which Chapman referred. Respondent even failed to take significant action after receiving complaints from the clients' family and Disciplinary Counsel. Under these circumstances, respondent was required to verify, at least minimally, the information he was given before he could reasonably rely on the instructions of his supervisor.

{¶ 20} In addition to the unauthorized assessment of a fee against the Reigers on the PIP coverage, respondent should have recognized that the fees collected were excessive under the terms of the fee agreement. The agreement permitted a contingent fee of 40 percent only if it was necessary to file suit, while a lower fee of 33 1/3 percent was to be charged if no lawsuit was needed. Although respondent did file suit against Seltzer, and thereby recovered through Seltzer's Geico liability policy, no action was ever filed against State Farm. State Farm made payments under the Reigers' PIP coverage upon receipt of the proper forms. Even if legal fees could have been collected on the PIP recovery, the contingent-fee agreement permitted respondent to collect only 33 1/3 percent of the recovery, rather than the 40 percent he did collect. Since respondent signed the agreement on behalf of the law firm and prepared the disbursement sheets, there would be no reasonable basis for him to rely on Chapman for these purposes.

{¶ 21} The board also found that respondent violated DR 6-101(A)(1) ("A lawyer shall not * * * [h]andle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it"). We agree. Respondent testified that he had a general understanding of PIP coverage but was unaware that he could not collect fees from the client. Respondent did not research the issue of attorney fees for helping a client obtain PIP benefits or associate with a lawyer who was familiar with PIP. He deferred to Chapman's statement that Chapman would speak to another

lawyer, but at no time did respondent have any contact with outside counsel or even verify that Chapman had done so.

### III. Sanction

{¶ 22} The proper sanction for violations of the Disciplinary Rules is determined after consideration of "the duties violated, respondent's mental state, the injury caused, the existence of aggravating or mitigating circumstances, and applicable precedent." *Disciplinary Counsel v. Evans* (2000), 89 Ohio St.3d 497, 501, 733 N.E.2d 609. The relevant factors are addressed below.

*A. Duties Violated and Injury Caused*

{¶ 23} Respondent violated two Disciplinary Rules through his conduct in charging two clients attorney fees that were prohibited by law. Although he was supervised by another attorney and given instructions on drafting the disbursement sheets he prepared, respondent either did not recognize the questionable nature of the fees or unreasonably relied on his superior. As a result, respondent's clients were forced to pay over $83,000 in illegal attorney fees, which they did not recover until after they filed a malpractice action.

*B. Aggravating and Mitigating Circumstances*

{¶ 24} A nonexhaustive list of the aggravating and mitigating circumstances that may be considered in disciplinary cases is found in Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). In mitigation, the board noted that respondent has no prior disciplinary record and that he displayed a cooperative attitude during the disciplinary process. BCGD Proc.Reg. 10(B)(2)(a), (d). Respondent also presented four witnesses that testified to his good character and to the fact that Chapman made all financial decisions of the law firm. BCGD Proc.Reg. 10(B)(2)(e).

**{¶ 25}** "Because each disciplinary case is unique, we are not limited to the aggravating and mitigating factors specified in BCGD Proc.Reg. 10(B) but may take into account 'all relevant factors' in determining what sanction to impose." *Cincinnati Bar Assn. v. Mullaney*, 119 Ohio St.3d 412, 2008-Ohio-4541, 894 N.E.2d 1210, ¶ 40, quoting BCGD Proc.Reg. 10(B). In *Mullaney*, for example, we noted one attorney's inexperience and the fact that the firm's established practices constrained his conduct. Id. That attorney was publicly reprimanded. Id. We similarly consider respondent's inexperience as an attorney and the fact that Chapman primarily controlled the firm's finances as mitigating factors in this case.

### C. Applicable Precedent

**{¶ 26}** We find three cases to be particularly relevant to our determination. The recent case of *Toledo Bar Assn. v. Sawers*, 121 Ohio St.3d 229, 2009-Ohio-778, 903 N.E.2d 309, involved conduct similar to that of respondent. There, the attorney was found to have violated the same two Disciplinary Rules as respondent, DR 2-106(A) and 6-101(A)(1), as well as DR 9-102(A) (requiring a lawyer to deposit client funds in a separate, identifiable bank account). Id. at ¶ 5-6. The attorney joined with a more seasoned attorney with whom she was previously affiliated to prepare trusts for clients. Id. at ¶ 3-5. The attorneys collected a fee of nearly $10,000 to prepare generic trust documents without considering the clients' particularized needs. Id. at ¶ 5. We issued a public reprimand. Id. at ¶ 9.

**{¶ 27}** In *Disciplinary Counsel v. Johnson*, 106 Ohio St.3d 365, 2005-Ohio-5323, 835 N.E.2d 354, ¶ 2, 5, and 9-22, the respondent attorney had overcharged for her services on numerous occasions related to her court-appointed representation of juvenile clients. She was found to be in violation of DR 2-106(A), for charging an excessive fee, among other rules, including DR 1-102(A)(4) (barring conduct involving dishonesty, deceit, fraud, or

misrepresentation). Id. at ¶ 40. After considering the respondent's inexperience and the fact that she was following the practices of another attorney who had served as her mentor, we imposed a one-year suspension from the practice of law, with six months stayed. Id. at ¶ 39, 41.

{¶ 28} In *Cincinnati Bar Assn. v. Mullaney*, 119 Ohio St.3d 412, 2008-Ohio-4541, 894 N.E.2d 1210, ¶ 5-6, 12, and 43-45, three attorneys were disciplined for representing a total of approximately 2,000 clients referred from a foreclosure-assistance company. The attorneys had little to no contact with each client and filed boilerplate pleadings on their behalf, while allowing nonlawyers from the company to negotiate with the clients' lenders. Id. at ¶ 15-17. We publicly reprimanded the inexperienced associate involved, finding him subject to discipline for failing to comply with the Disciplinary Rules but noting his efforts on behalf of the clients within the constraints of the firm's established practices. Id. at ¶ 40.

{¶ 29} The board's recommendation of a public reprimand is consistent with our precedent involving cases of similar misconduct and similarly inexperienced attorneys.

*D. Determination*

{¶ 30} Respondent's conduct in this case constituted violations of two Disciplinary Rules. We accordingly adopt the board's recommended sanction of a public reprimand. Costs are taxed to respondent.

Judgment accordingly.

PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Heather L. Hissom, Assistant Disciplinary Counsel, for relator

Koblentz & Koblentz, Richard S. Koblentz, and Craig J. Morice, for respondent.

————————————